NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180656-U

NO. 4-18-0656

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 26, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| DEONTAE L. FRANKLIN, | ) | No. 17CF534 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Nancy S. Fahey, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Knecht and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, concluding the trial court did not err in imposing a 24-year sentence.

¶ 2    Following a June 2018 trial, a jury found defendant, Deontae L. Franklin, guilty of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)).  In August 2018, the trial court sentenced defendant to 24 years' imprisonment.

¶ 3    Defendant appeals, arguing the trial court abused its discretion in sentencing defendant to 24 years in prison for aggravated battery with a firearm where the court (1) misapprehended the trial evidence, (2) considered an improper aggravating factor in characterizing the circumstances of the offense, (3) refused to consider defendant's mitigation evidence as a factor in sentencing, and (4) failed to consider defendant's demonstrated potential for rehabilitation.  We affirm.

¶ 4                                   I. BACKGROUND

¶ 5        In July 2017, the State charged defendant by information with aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)) (count I) and aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(2)(3)(C) (West 2016)) (count II).  Prior to trial, the State dismissed count II.

¶ 6                            A. Defendant's Jury Trial

¶ 7        Below, we summarize the relevant testimony elicited during defendant's June 2018 jury trial.

¶ 8                                1. *Lashawn Clark*

¶ 9        Lashawn Clark, defendant's ex-girlfriend, testified that on July 29, 2017, she lived in an apartment at 1227 Clarence Street in Danville, Illinois.  Clark indicated that when she lived on Clarence Street, defendant stayed with her four to five times a week and defendant kept clothes there in a closet.

¶ 10        Clark recounted that around 4 a.m. on July 29, 2017, defendant and two of his cousins came to her apartment to hang out.  At one point, defendant and his two cousins argued about family issues.  Next, a "very intoxicated" man she did not know came into her apartment.  Clark observed this man with a bottle of Bacardi in his hand, and he asked people for drugs.  Clark testified everyone was irritated with this man and they asked him to leave.  While the man initially left, at some point, the man came back inside the apartment.  Clark stated the man's behavior exacerbated everyone's anger, particularly where defendant and his cousins had been in an argument before the man arrived.

¶ 11        Around 7 a.m., Clark went into her bathroom because she was afraid the family was going to fight "the drunk man."  While in the bathroom, Clark heard one gunshot and stayed

in the bathroom for about a minute. Clark then left the bathroom, grabbed her keys, locked the door to her apartment, and left in a red or maroon van with defendant to go to his uncle's house. Clark testified that when she exited the bathroom everyone had left and gone their separate ways. Clark never saw defendant with a gun.

¶ 12       Clark represented that around 10 a.m. on August 1, 2017, police officers came to her apartment to talk with her about the incident and defendant's whereabouts. Clark let the officers into her apartment where officers observed defendant in the back bedroom. Subsequently, the officers arrested defendant. The officers also searched Clark's apartment and found a handgun inside a wall in the closet defendant used. Clark told police she had never seen the gun before.

¶ 13                    2. *Bobby Hansbrough*

¶ 14       Bobby Hansbrough, the shooting victim, testified that on the night of July 28, 2017, he drank alcohol and possibly used cocaine at his brother's house. In the early morning of July 29, 2017, Hansbrough left his brother's house to walk to his niece's house when he saw two men he knew standing outside of an apartment at 1227 Clarence Street. Hansbrough joined the two men in conversation. At the time Hansbrough came across the two men, he was drinking from a bottle of alcohol.

¶ 15       Hansbrough and the two men eventually went inside the apartment. Hansbrough testified there were other people in the apartment he did not know. Hansbrough said everyone was drinking and having a good time except defendant who "seemed upset" and "hyper, like he was upset about something[.]" Hansbrough also stated "one time [defendant] came into the living room brandishing a firearm." At some point defendant asked Hansbrough to leave the

apartment, so he left the apartment with the bottle of alcohol in his hand.  Hansbrough testified he intended to walk to his niece's house.

¶ 16     After Hansbrough left the apartment, he heard a door open and someone walking behind him.  Hansbrough turned around and saw defendant holding the same "chrome gun with the black handle in his hand[.]"  Hansbrough estimated defendant shot him in the stomach from about 10 feet away.  When asked what happened when the bullet hit him in the stomach, Hansbrough replied, "[i]t hit my right hip and knocked my leg from up out under me and I hit the ground."  Hansbrough testified no argument arose between defendant and him before defendant shot him.

¶ 17     After Hansbrough fell, he looked at defendant who was trying to move the slide to fire the gun again.  However, the gun appeared to have jammed.  Hansbrough stated, "it looked like he wanted to shoot me again[.]"  Defendant never shot at Hansbrough a second time.  Rather, defendant said, "F this shit" and went back into the apartment.  Hansbrough then heard people coming outside and someone saying, "Get in the van[,]" but Hansbrough did not see who got into the van.  He only heard the van start up and drive off.  Hansbrough testified he observed a red or maroon van parked in the front of the apartment when he arrived at the apartment.

¶ 18     An ambulance transported Hansbrough to the hospital where he stayed for seven days.  Doctors removed two feet of intestine from Hansbrough's body.  Doctors were unable to remove the bullet from his right hip, which affected his gait and disturbed his sleep.  Hansbrough had a permanent surgical scar from his groin to the middle of his stomach.

¶ 19     Hansbrough also addressed his criminal history.  Specifically, Hansbrough recounted a 2012 conviction for criminal trespass to a residence and his 2007 conviction for aggravated battery to a police officer.

¶ 20                    3. *Juan Garza*

¶ 21            Juan Garza testified that on July 29, 2017, he lived across the street from Clark's apartment.  Around 7 a.m. on July 29, 2017, Garza arrived home from work and observed two men he did not recognize arguing outside.  Garza went inside his house and then he heard "two pops[,]" which he thought were gunshots.  Garza looked out his window and saw Hansbrough lying on the ground and a maroon van leaving the scene.  Garza testified he did not see who drove or was in the van and he also could not identify the shooter.  Garza did recall observing the maroon van at the apartment complex a few times prior to July 29, 2017.  After Garza looked out his window, he went over to check on Hansbrough and called 911.

¶ 22                    4. *Officer Brian Lange*

¶ 23            Brian Lange, a police officer with the Danville Police Department, testified that on July 29, 2017, he responded to a call reporting a gunshot victim at 1227 Clarence Street.  Once he arrived on scene, Officer Lange observed Hansbrough lying on the ground with his hand over his stomach.  Officer Lange indicated Hansbrough was conscious and breathing but unable to speak.  Officer Lange asked Hansbrough if he knew who shot him, and Hansbrough nodded his head but did not give a name.  Officer Lange then asked Hansbrough if a maroon van was involved in the incident, and Hansbrough again nodded his head.

¶ 24            Officer Lange testified officers recovered a shell casing on the ground about a foot to a foot-and-a-half away from where Hansbrough's head rested.  Police also recovered a bottle of alcohol bearing Hansbrough's fingerprints.

¶ 25                    5. *Detective Patrick Carley*

¶ 26            Patrick Carley, a detective with the Danville Police Department, detailed that after an initial investigation, Detective Phil Wilson created a photo array of potential suspects to show

Hansbrough. Then, Detective Carley and Detective Wilson went to the hospital to show Hansbrough the photo array. After looking at the photo array, Hansbrough identified defendant as the person who shot him.

¶ 27    On August 1, 2017, Detective Carley was one of the officers who went to Clark's apartment to locate and arrest defendant. Detective Carley indicated officers found a gun in a bedroom and he took pictures of the gun. The gun was a chrome and black handgun.

¶ 28    6. *Detective Phil Wilson*

¶ 29    Phil Wilson, a detective with the Danville Police Department, testified that on August 1, 2017, he was one of the officers who went to Clark's apartment to locate and arrest defendant. Upon entry into Clark's apartment, Detective Wilson observed defendant in a bedroom. After Clark gave the officers permission to search her apartment, officers found two firearms in a bedroom closet. Detective Wilson identified the two firearms as a wood-handled revolver and a chrome .380-caliber semiautomatic handgun. Detective Wilson retrieved the firearms.

¶ 30    Detective Wilson testified the chrome semiautomatic handgun had a live round in the chamber, meaning the gun was ready to be fired. Detective Wilson testified that in a semiautomatic gun, if the slide is open and somebody inserts the magazine hard enough, the round will automatically be fed into the chamber. Otherwise, the individual would have to pull back on the slide to chamber another round. Detective Wilson inventoried the gun and took deoxyribonucleic acid (DNA) swabs from the slide and trigger.

¶ 31    Detective Wilson recounted he prepared the photo array shown to Hansbrough. Detective Wilson and Detective Carley showed Hansbrough the photo array while he was in the

hospital. Detective Wilson confirmed Hansbrough identified defendant as the person who shot him.

¶ 32                    7. *Officer Travis Spain*

¶ 33          Travis Spain, a police officer with the Danville Police Department, testified he was one of the officers who went to Clark's apartment on August 1, 2017, to locate and arrest defendant. Upon arrival at Clark's apartment, she consented to officers searching her apartment. Officer Spain searched a bedroom closet and noticed a piece of drywall in the closet had been cut out and put back in. Officer Spain removed the piece of drywall and observed a gun on the floor. Officer Spain then notified Officer Carley of the presence of the gun.

¶ 34                    8. *Hali Carls-Miller*

¶ 35          Hali Carls-Miller, a firearms expert with the Illinois State Police crime laboratory, testified she fired test shots from the .380-caliber handgun recovered from Clark's apartment and compared the expelled cartridge cases to the cartridge case officers recovered at the scene of the shooting. Carls-Miller determined the cartridge case from the scene was fired from the .380-caliber handgun recovered from Clark's apartment.

¶ 36                    9. *Stipulations*

¶ 37          The parties stipulated the DNA analysis performed on swabs from the handgun contained DNA from at least one person, but the profile was incomplete and unsuitable for comparison. The parties also stipulated that Hansbrough's blood-alcohol content (BAC) upon arrival at the hospital on July 29, 2017, was 0.252.

¶ 38                    10. *Jury Verdict*

¶ 39          At the close of trial, the jury found defendant guilty of one count of aggravated battery with a firearm.

¶ 40                                              B. Sentencing

¶ 41            In July 2018, defendant filed a motion for a new trial.  At the August 2018 sentencing hearing, the trial court denied the motion.  The court took into consideration defendant's presentence investigation report (PSI) and the victim's impact statement.  Defendant's PSI contained defendant's criminal, employment, and substance-abuse history.  Specifically, defendant was convicted in 2013 of possession of a controlled substance in Vermilion County case No. 13-CF-131 and received second-chance probation—which was terminated successfully.  Defendant also had several traffic citations.  Defendant disclosed he consumed a half pint of alcohol daily and used marijuana up to four or five times a day.  Defendant acknowledged he needed substance-abuse treatment or counseling.

¶ 42            The court also heard evidence in aggravation and mitigation.  Defendant called three witnesses to testify.

¶ 43            Ramona Robinson, defendant's mother, testified she owned a daycare, and defendant assisted her with the children and performed repairs around the facility.  Robinson indicated things would be difficult for her in defendant's absence.  Robinson also informed the court defendant received good grades in school, ran track, played basketball, and never gave his teachers or her any trouble.

¶ 44            Jamenesha Franklin, defendant's sister, described defendant as "her protector[.]"  Defendant helped her with her three children, one of whom died a few months before the shooting incident.  Franklin testified her daughter was diagnosed with cancer, and defendant drove them to Memphis, Tennessee, to seek medical treatment.  Franklin also represented that defendant was like a father to her two sons.  He took them to the park and played sports with them.

- 8 -

¶ 45    Brandi Brooks, mother to defendant's seven-year-old son, testified she rescheduled an interview in order to appear in court to testify on defendant's behalf. Brooks testified she and defendant were great at co-parenting. Defendant paid child support and spent time with their son.

¶ 46    After defendant's witnesses testified, the parties presented their sentencing recommendations. Defendant faced a mandatory prison sentence of 6 to 30 years. The State sought a 25-year prison sentence. Defense counsel urged the court to impose the minimum six-year prison sentence.

¶ 47    Defendant made a statement in allocution. In allocution, defendant stated, "I just want to tell you, Ms. Fahey, that 35 years of my life, never did any harm to anybody, never was a violent person. I know I've been convicted of a violent crime, but violence is not me. It's not me at all. I'm just—I want you to consider that when you sentence me today."

¶ 48    Ultimately, the trial court sentenced defendant to 24 years' imprisonment, followed by 3 years of mandatory supervised release. In sentencing defendant, the court stated,

> "Well unfortunately, as you said it yourself, this is a violent crime, and obviously, none of us were there to know what really happened, but the jury heard enough evidence to find you guilty of this charge, and while I certainly respect your family members for coming in here and supporting you, and I believe what they are telling me about you, that doesn't alleviate the crime that was committed and the harm that was done to another individual. You know, you—Mr. Hansbrough, no matter how annoying he may have been, nothing that the Court heard during the trial amounted

to an excuse or a valid reason to shoot this person in the back, and then to flee and leave him bleeding there on the pavement. It's just inexcusable. It's disgusting, really. I mean, it's really disgusting that you would, number one, felt like it was necessary to resort to that type of behavior; and number two, that you had absolutely no remorse or empathy after you committed the crime and you left him laying there bleeding. It's just lucky that someone found him, or he probably would have been dead, and you would have been facing much more serious charges than you are now.

I think the statutory—the non-statutory factors that—let me start with the mitigating factors. Certainly, the testimony from your family members, they are sad about this, they are upset about this, they want you in their life. They see you as somebody totally different than the person that committed this crime, and I understand that. But none of that testimony, in my opinion, rose to the level of a substantial hardship to your family. I mean, it certainly rises to the level of sadness and emptiness, and they will miss you, but it didn't rise to the level, even with your son, as a substantial hardship, in the Court's opinion, so I'm not considering that as a factor in mitigation, and the bottom line is, you are responsible for your own actions.

When I look at the factors in aggravation, specifically the non-statutory ones that [the State] brought out, I do agree that this

occurring in a residential area puts a number of people at risk, not just the person you shot, so that is definitely a concern of the Court and something the Court takes into consideration. And once again, I've already mentioned it, but there was no—not that there is a valid reason for shooting another person, unless it's self defense, which certainly wasn't the situation in this case. I mean, you shot him as he was walking away. He was annoying you guys. You wanted to get rid of him. He was leaving and he was walking away, and you shoot him. It's just—you know, no excuse or reason to support, you know, doing that. And once again, you left him laying there bleeding. He had serious, life-threatening injuries, which are going to affect him for the rest of his life. So those are all non-statutory factors that the Court is considering.

And I consider the factors in mitigation that are laid out in the statute. Obviously, your conduct caused offer [*sic*] threatened serious harm to another person. You have a history of prior delinquency or criminal activity, albeit a very minimal history, but there is a history, and the biggest factor is that the sentence is necessary to deter others from committing the same crime. Gun violence in our community is rampant, and it's—you know, it's not just your community. The community belongs to everyone in this courtroom, and so everybody in this courtroom is put at risk by activity like this, and it's indefensible, inexcusable, and I just

absolutely cannot tolerate it, and I have to send a strong message to those of you participating in this type of activity that I'm not going to tolerate it.

So having regard to the nature and circumstance of the offense, and to the history, character and condition of the offender, the Court is sentencing you to 24 years in the Illinois Department of Corrections, three years mandatory supervised release, which used to be called parole. The sentence will be served at 85 percent. You'll get credit for 367 days served, and that's from August 1, 2017, through August 2, 2018. You would be ordered to pay costs, fees, fines and assessments ***."

¶ 49                                  C. Motion to Reconsider

¶ 50        In August 2018, defendant filed a motion to reconsider his sentence. Defendant claimed his sentence was excessive and the trial court erred in analyzing certain factors. Specifically, the court's consideration that Hansbrough was shot in the back while walking away was improper, as the evidence showed Hansbrough was shot in the stomach, and Garza's testimony that the two men were arguing before the gunshot undermined Hansbrough's testimony that he and defendant exchanged no words before the gunshot. Further, the court erred in considering the nonstatutory aggravating factor that the location of the shooting put others at risk, where the evidence showed the gunshot was at close range. The court also placed improper emphasis on gun violence in the community in general and incorrectly found no mitigation existed in this case. Following argument, the court denied defendant's motion to reconsider.

¶ 51        This appeal followed.

¶ 52                                    II. ANALYSIS

¶ 53        On appeal, defendant argues the trial court abused its discretion in sentencing him to 24 years in prison for aggravated battery with a firearm where the court (1) misapprehended the trial evidence; (2) considered an improper aggravating factor in characterizing the circumstances of the offense; (3) refused to consider his mitigation evidence as a factor in sentencing; and (4) failed to consider his demonstrated potential for rehabilitation.  In response, the State argues the trial court did not abuse its discretion in sentencing defendant to 24 years' imprisonment and any error in the court's findings was harmless.  The State also suggests defendant has forfeited his arguments on appeal where no objection was made during the sentencing hearing.

¶ 54        Initially, we determine whether defendant has forfeited his arguments on appeal. In this instance, we follow our supreme court and conclude it was not necessary for counsel to interrupt the judge and indicate she was allegedly committing error in imposing sentence.  See *People v. Saldivar*, 113 Ill. 2d 256, 266, 497 N.E.2d 1138, 1141 (1986).  Moreover, defense counsel filed a detailed motion to reconsider defendant's sentence raising the sentencing issues put forward in this appeal.  Therefore, we decline to find forfeiture.  We now turn to defendant's claims.

¶ 55        The trial court has discretion in sentencing and we will not reverse a sentence absent an abuse of discretion.  *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656.  Such discretion in sentencing is necessary because "the trial court is in a better position to judge the credibility of the witnesses and the weight of the evidence at the sentencing hearing ***." *People v. Ramos*, 353 Ill. App. 3d 133, 137, 817 N.E.2d 1110, 1115 (2004).

¶ 56      The trial court errs where the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210, 737 N.E.2d 626, 629 (2000). As the court determines an appropriate sentence, "a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment, must be equally weighed." *People v. Hernandez*, 319 Ill. App. 3d 520, 529, 745 N.E.2d 673, 681 (2001). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *People v. Franks*, 292 Ill. App. 3d 776, 779, 686 N.E.2d 361, 363 (1997).

¶ 57      In determining defendant's sentence, the trial court considered the information in the PSI, the evidence presented at the sentencing hearing, the recommendations of counsel, defendant's statement in allocution, and the relevant statutory and nonstatutory factors in aggravation and mitigation. The court summarized its reasoning for sentencing defendant to 24 years' imprisonment by discussing the specific facts of the shooting, the potential hardships placed on defendant's family by his incarceration, the risk of harm the shooting caused to others, the seriousness of the harm to the victim, defendant's criminal history, the need for deterrence, and the prevalence of gun violence in the community.

¶ 58      Defendant argues the trial court abused its discretion in sentencing defendant to 24 years in prison. Defendant asserts the court misapprehended the trial evidence where the court described defendant as having shot Hansbrough in the back. Specifically, defendant points to the following statement by the court: "[N]o matter how annoying he may have been, nothing that the Court heard during the trial amounted to an excuse or a valid reason to shoot this person

- 14 -

in the back, and then to flee and leave him bleeding there on the pavement." Further, the court stated,

> "I mean, you shot him as he was walking away. He was annoying
> you guys. You wanted to get rid of him. He was leaving and he
> was walking away, and you shoot him. It's just—you know, no
> excuse or reason to support, you know, doing that. And once
> again, you left him laying there bleeding."

¶ 59    Defendant argues the trial court improperly stated Hansbrough was shot in the back when really, he was shot in the stomach. Moreover, defendant argues the court's finding Hansbrough was walking away when defendant approached and shot him was incorrect based on the testimony of Garza who saw two men arguing before he heard a gunshot.

¶ 60    The evidence in the record shows defendant asked Hansbrough to leave Clark's apartment and he obliged. As he walked away, Hansbrough heard someone behind him and turned around to see who was behind him. As Hansbrough turned around, defendant shot him in the stomach; specifically, the shot entered Hansbrough's stomach and lodged into his right hip. The evidence shows Hansbrough was walking away and not directly facing defendant when he was shot. Therefore, the court did not misapprehend the evidence where it stated defendant shot Hansbrough as he walked away.

¶ 61    Moreover, while Garza testified he observed two men arguing before he heard a gunshot, he was inside his home when he heard the gunshot and failed to see the actions immediately before the shooting. This was apparent where Garza stated he was inside his home when the gunshot went off and thus unable to identity the shooter. Based on the evidence, Garza's testimony does not speak to what happened immediately before the shooting and

whether Hansbrough was walking away when defendant shot him. After reviewing the record, we find the trial court did not err in its characterization of the events prior to the shooting.

¶ 62        Next, defendant argues the trial court considered an improper aggravating factor in characterizing the circumstances of the offense. Specifically, defendant asserts the trial court erred in considering the location of the shooting as a nonstatutory aggravating factor. The court stated, "I do agree [with the State] that this occurring in a residential area puts a number of people at risk, not just the person you shot, so that is definitely a concern of the Court and something the Court takes into consideration."

¶ 63        Defendant asserts the area of the shooting, an apartment complex where multiple people live, should not have been considered as a nonstatutory aggravating factor because the evidence shows defendant only fired one shot at Hansbrough while approximately 10 feet from Hansbrough. Defendant further asserts no other persons were outside at the time of the shooting and when the police knocked on apartment doors as they canvased the scene, no one answered.

¶ 64        We find the trial court did not err in considering the location of the shooting as a nonstatutory aggravating factor at sentencing. While the evidence shows no one else was outside at the exact moment defendant shot Hansbrough, other people were in the vicinity of the apartment complex at the time. Multiple witnesses testified to a group of people inside Clark's apartment immediately before the shooting and Garza, who lived across the street from Clark's apartment, testified he witnessed two men fighting when he arrived home from work and later heard two gunshots while in his home. Therefore, consideration of the location of the shooting as a nonstatutory aggravating factor was not improper where the risk of harm to others was present.

¶ 65          Further, defendant argues the trial court relied on the aforementioned improper factor to conclude that the circumstances of the offense were so serious as to justify a sentence 18 years above the minimum sentence and 6 years below the maximum sentence. Defendant contends the trial court barely mentioned the degree of harm to Hansbrough in its findings. Defendant asserts the seriousness of the offense is the most important factor that a court must consider in fashioning an appropriate sentence. See *People v. Quintana*, 332 Ill. App. 3d 96, 109, 772 N.E.2d 833, 845-56 (2002).

¶ 66          We find, based on the record, the trial court considered the harm to the victim as a nonstatutory aggravating factor. The court addressed the harm to the victim three times when giving its reasoning at sentencing. Specifically, the court stated,

> "It's just inexcusable. It's disgusting, really. I mean, it's really
> disgusting that you would, number one, feel like it was necessary
> to resort to that type of behavior; and number two, that you had
> absolutely no remorse or empathy after you committed the crime
> and you left him laying there bleeding. It's just lucky that
> someone found him, or he probably would have been dead, and
> you would have been facing much more serious charges than you
> are now."

The court further stated, "And once again, you left him lying there bleeding. He had serious, life-threatening injuries, which are going to affect him for the rest of his life." Last, the court stated, "Obviously, your conduct caused offer [*sic*] threatened serious harm to another person." Therefore, we find the court properly considered the degree of harm to Hansbrough and did not abuse its discretion in considering the relevant nonstatutory aggravating factors.

¶ 67    Next, defendant argues the trial court refused to consider defendant's mitigation evidence as a factor in sentencing. Specifically, defendant asserts he presented three witnesses at sentencing and the court explicitly declined to consider their testimony in mitigation where the court stated, "I'm not considering that as a factor in mitigation."

¶ 68    "When mitigation evidence is before the court, it is presumed that the sentencing judge considered the evidence, absent some indication, other than the sentence imposed, to the contrary." *People v. McCarthy*, 213 Ill. App. 3d 873, 878-88, 572 N.E.2d 1219, 1228 (1991).

¶ 69    Here, all the evidence relied upon by defendant as evidence in mitigation was before the trial court in the PSI and the testimony presented at the sentencing hearing. Contrary to defendant's assertion, the court considered the support of defendant's family, the impact on defendant's family, defendant's prior minimal criminal history, and other relevant statutory factors in mitigation.

¶ 70    The trial court expressly considered the impact of a sentence upon defendant's family but determined the hardship to the family did not rise to the level necessary to reduce his sentence. Specifically, the court stated, "But none of that testimony, in my opinion, rose to the level of a substantial hardship to your family. I mean, it certainly rises to the level of sadness and emptiness, and they will miss you, but it didn't rise to the level, even with your son, as a substantial hardship ***." Defendant fails to show the court did not consider the evidence in mitigation where the court recognized the potentially mitigating evidence, but found the evidence unpersuasive and of a quality that failed to rise to the level required to be considered in mitigation.

¶ 71    Defendant further argues the trial court failed to take into consideration his alcohol and substance-abuse problems as a factor in mitigation. Defendant asserts the PSI

indicated he suffered from alcohol and substance abuse where he disclosed he consumed a half pint of alcohol daily and used marijuana up to four or five times a day.

¶ 72            A trial court is not required to expressly indicate its consideration of all mitigating factors and the weight given to them. *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 43, 2 N.E.3d 333. Here, while the trial court did not expressly mention defendant's alcohol or substance-abuse problems at sentencing, the court took the PSI into consideration when sentencing defendant. The only time defendant mentioned having alcohol or substance-abuse problems was in the PSI. Therefore, the court did not err in failing to discuss defendant's alcohol or substance abuse problems when handing down defendant's sentence. We find the court's appraisal of the weight to be given to the mitigating evidence was not an abuse of discretion.

¶ 73            Last, defendant argues the trial court failed to consider his demonstrated potential for rehabilitation. Defendant asserts he exhibited rehabilitative potential where he helped his mother with her daycare, helped his sister with her children, paid child support to his son's mother, had one prior felony conviction and received second-chance probation, expressed a desire for rehabilitation, and was a good student in school.

¶ 74            "Where the sentencing court examines a presentence report, it is presumed that the court considered the defendant's potential for rehabilitation." *People v. Wright*, 272 Ill. App. 3d 1033, 1046, 651 N.E.2d 758, 766 (1995).

¶ 75            Here, the trial court took into consideration the PSI prior to sentencing defendant. The PSI indicated defendant scored high on tests for risk to reoffend. Defendant was convicted in 2013 of possession of a controlled substance in Vermilion County case No. 13-CF-131 and received second-chance probation—which was terminated successfully. As part of his

second-chance probation, defendant was "ordered to obtain a substance[-]abuse assessment and comply with the recommendations." However, defendant described that prior to his incarceration, he consumed a half pint of alcohol daily and used marijuana up to four or five times a day. Therefore, we find based on the record, the court did not fail to consider defendant's rehabilitative potential. Further, the court did not abuse its discretion in failing to explicitly discuss whether defendant exhibited rehabilitative potential.

¶ 76    We find the trial court did not abuse its discretion in sentencing defendant to 24 years in prison. The court's determination reflected a balancing of the appropriate factors with an emphasis on the nature and circumstances of the offense; the history, character, and condition of the offender; and the need for deterrence. Accordingly, we affirm the trial court's judgment.

¶ 77                    III. CONCLUSION

¶ 78    For the foregoing reasons, we affirm the trial court's judgment.

¶ 79    Affirmed.