NOTICE
Decision filed 10/24/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 231068-U

NO. 5-23-1068

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Vermilion County. |
| | ) | |
| v. | ) | No. 17-CF-534 |
| | ) | |
| DEONTAE FRANKLIN, | ) | Honorable |
| | ) | Derek J. Girton, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1　*Held*:　The circuit court did not err in denying the petitioner's postconviction petition after a third-stage hearing on his actual innocence claim, where the petitioner did not present sufficient evidence of actual innocence to warrant a new trial. As any arguments to the contrary would lack merit, we grant petitioner's appointed counsel on appeal leave to withdraw and affirm the circuit court's judgment.

¶ 2　Petitioner Deontae Franklin was sentenced to 24 years in the Illinois Department of Corrections for aggravated battery with a firearm. He appeals from the third-stage dismissal of his postconviction petition. Franklin's appointed attorney in this appeal, the Office of the State Appellate Defender (OSAD), has concluded that this appeal lacks substantial merit and has filed a motion to withdraw as counsel pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), along with a supporting memorandum.

1

¶ 3     This court gave Franklin an opportunity to file a *pro se* brief, memorandum, or other document explaining why OSAD should not be allowed to withdraw, or why this appeal has merit, and he has not done so. This court has examined OSAD's *Finley* motion and the accompanying memorandum of law, as well as the entire record on appeal, and has concluded that this appeal does indeed lack merit. Accordingly, OSAD is granted leave to withdraw as counsel, and the judgment of the circuit court is affirmed.

¶ 4                                    I. BACKGROUND

¶ 5                          A. Underlying Incident and Trial

¶ 6     Franklin was charged with one count of aggravated battery with a firearm stemming from a July 29, 2017, incident in which he allegedly shot Bobby Hansbrough in the stomach. The matter proceeded to a jury trial in June 2018.

¶ 7                                    1. Lashawn Clark

¶ 8     At trial, Lashawn Clark testified that she was Franklin's ex-girlfriend, and in July 2017, Franklin would stay over at her apartment four to five times a week. She said that he had his own closet in the bedroom, where he kept his clothes. Around 4 a.m. on the day of the incident, Clark, Franklin, and two of Franklin's cousins were hanging out at Clark's apartment. A "very intoxicated" man came into the apartment holding a bottle of Bacardi. No one in the apartment knew who this man was. Clark testified that the man kept asking for drugs, which irritated everyone, and they asked him to leave. The man then left, but later returned to Clark's apartment. The unknown man's behavior exacerbated everyone's anger, particularly because Franklin and his cousins had been arguing before he arrived.

¶ 9     Clark stated that, at some point after the man's return, she went into the bathroom, because she was scared that the others were going to fight the drunk man. While she was in the bathroom,

she heard a gunshot. She remained in the bathroom for another minute, and when she came out, everyone else had left the apartment. Clark and Franklin drove to Franklin's uncle's house in a red/maroon minivan, and everyone else walked away. Clark testified that she did not see Franklin or anyone else with a gun that day.

¶ 10 Clark also stated that on August 1, 2017, police officers came to her apartment to talk with her about the incident and Franklin's whereabouts. Clark let the officers into her apartment, and upon observing Franklin in the back bedroom, he was arrested. The officers also searched Clark's apartment and found a handgun inside a wall in the closet where Franklin kept his clothes. Clark told police she had never seen the gun before.

¶ 11                                    2. Bobby Hansbrough

¶ 12 The unknown drunk man was later identified as Bobby Hansbrough. Hansbrough recounted his criminal history—specifically, a 2012 conviction for criminal trespass to a residence and his 2007 conviction for aggravated battery to a police officer.

¶ 13 He testified that on the night of July 28, 2017, he had been drinking and possibly using cocaine. In the early morning of July 29, 2017, he was walking to his niece's house drinking from a bottle of alcohol when he saw two men he knew standing outside an apartment (the building in which Clark resided). Hansbrough joined the two men in conversation, and they all eventually went into the apartment the two men had come from, where they continued drinking and talking. Hansbrough testified there were other people in the apartment he did not know. He said everyone was drinking and having a good time except Franklin, who "seemed upset" and "hyper, like he was upset about something." Hansbrough also stated "one time [Franklin] came into the living room brandishing a firearm." At some point Franklin asked Hansbrough to leave the apartment, so

3

he left the apartment with the bottle of alcohol in his hand. Hansbrough testified he intended to walk to his niece's house.

¶ 14  After Hansbrough left the apartment, he heard a door open and someone walking behind him. Hansbrough turned around and saw Franklin holding the same "chrome gun with the black handle in his hand." Hansbrough testified that Franklin shot him in the stomach from about 10 feet away. Hansbrough stated that he and Franklin did not argue before Franklin shot him. Hansbrough testified that after fell to the ground, he sobered up quickly because "it was a moment of clarity" for him. Hansbrough looked Franklin "dead in the eye" and saw him "trying to slide the gun again" in an apparent attempt to shoot him again, but the gun appeared to have jammed. Franklin said "F this shit" and went back into the apartment.

¶ 15  Sometime later, while still on the ground, Hansbrough heard someone say, "Get in the van." He did not see who got in; he just heard the van start up and drive off. Hansbrough testified there was a maroon/reddish van that had been parked in front of the apartment while he was there. Hansbrough testified he had no doubt in his mind that Franklin was the man who shot him, and that he used the same chrome gun with a black handle that he had brandished in the apartment earlier.

¶ 16                                    3. Juan Garza

¶ 17  Juan Garza testified that he lived across the street from Clark's apartment. He was coming home from work on July 29, 2017, some time after 7 a.m., and saw two men he did not know arguing outside. Garza went inside his house and then heard two "pops," which he thought were gunshots. Garza looked out of his window and saw Hansbrough lying on the ground and a maroon minivan leaving the scene. He did not see who entered or drove the minivan, nor could Garza

4

identify the shooter. Garza had seen the maroon minivan at the apartment complex a few times before.

¶ 18                                    4. Officer Brian Lange

¶ 19    Officer Brian Lange testified that he arrived on the scene and saw Hansbrough on the ground with his hand over his stomach. Lange asked Hansbrough if he knew who shot him, and Hansbrough nodded his head in the affirmative, but did not give a name because he could not speak. Lange then asked Hansbrough if a van was involved in the incident, and Hansbrough again nodded his head in the affirmative. Officers recovered a shell casing about a foot to a foot-and-a-half from where Hansbrough's head was. They also recovered a bottle of alcohol, which had Hansbrough's fingerprints on it.

¶ 20                                    5. Detective Patrick Carley

¶ 21    Patrick Carley, a detective with the Danville Police Department, testified that he and Detective Phil Wilson saw Hansbrough in the hospital to show him a photo array of potential suspects. Franklin was included in the array because Carley had learned that the maroon van parked outside Clark's apartment complex was registered to Franklin's mother. After looking at the photo array, Hansbrough identified defendant as the person who shot him.

¶ 22    On August 1, 2017, Detective Carley was one of the officers who went to Clark's apartment to locate and arrest Franklin. Detective Carley indicated officers found a gun hidden behind the drywall in the back of a closet in the bedroom. The gun was a chrome .380-caliber semiautomatic gun with a black handle.

¶ 23                                    6. Hali Carls-Miller

¶ 24    Hali Carls-Miller, a firearms expert, testified that she fired some test shots from the chrome .380 gun and compared the expelled cartridge cases to the cartridge case the officers recovered at

5

the scene next to Hansbrough's head. Carls-Miller determined that the cartridge case recovered from the scene was fired from the .380 chrome gun recovered from behind the drywall in the closet where Franklin kept his clothes.

¶ 25                                    7. Verdict and Sentencing

¶ 26    At the conclusion of the trial, the jury found Franklin guilty of aggravated battery with a firearm. The circuit court imposed a 30-year sentence. The conviction and sentence were upheld on direct appeal. See *People v. Franklin*, 2020 IL App (4th) 180656-U.

¶ 27                                    B. Postconviction Proceedings

¶ 28    Franklin filed a *pro se* postconviction petition on August 12, 2021. Although he mislabeled it as a "successive" petition, the parties agree that this was his first and only postconviction petition. In his petition, Franklin alleged that newly discovered evidence, in the form of a May 7, 2021, affidavit from Hansbrough, the shooting victim, demonstrated his actual innocence and a fundamental miscarriage of justice where Hansbrough recanted his identification of Franklin as the shooter.

¶ 29    Franklin contended that the only evidence of his being the shooter that the State presented at trial was the identification testimony from Hansbrough. Franklin also noted Hansbrough's intoxicated state and .252 blood-alcohol content at the time of the shooting, and that the gun found hidden behind the drywall of the closet where he kept clothes did not have his DNA or fingerprints on it. He further claimed that anyone who used the apartment's bathroom had to walk through the only bedroom to get there, suggesting that anyone who ever had access to the bathroom also had access to the bedroom—and therefore the space behind the closet where the gun was found. Franklin acknowledged that the firearm expert established that the shell casing found on the ground near Hansbrough's body right after the shooting was fired from the gun in question. However, he

6

claimed that this did not establish exactly when the casing was fired, who fired it, or if the gun found behind the drywall was the one used in the shooting.

¶ 30 In the affidavit, Hansbrough averred that he identified the wrong man after someone else who closely resembled Franklin approached him on the street and told him he was thankful that Hansbrough was "a crack-head and a stupid drunk," which made Hansbrough realize that this unknown person on the street, and not Franklin, was the person who shot him. Hansbrough asserted that the resemblance of this unknown person to Franklin "is almost incredible to believe," and apologized to the court and Franklin for mistakenly accusing "the wrong man." Hansbrough also stated that he was extremely intoxicated and under the influence of mind altering drugs at the time of the shooting, "and was almost positive it was [Franklin] but it wasn't."

¶ 31 On August 19, 2021, the circuit court entered an order advancing the cause to the second stage of postconviction proceedings, and appointed counsel to represent Franklin. On October 13, 2023, postconviction counsel filed an amended postconviction petition on Franklin's behalf, as well as a Rule 651 certificate. Counsel reiterated Franklin's actual innocence claim based on Hansbrough's recanted identification and attached Hansbrough's affidavit to the amended petition. Counsel added that the newly discovered affidavit from Hansbrough was material, not cumulative, and undermined confidence in the guilty verdict given Hansbrough's state of intoxication at the time of the shooting, which made his initial identification of Franklin wholly unreliable.

¶ 32 The State moved to dismiss, arguing first that Franklin "ostensibly attempted to avoid" having his initial petition dismissed as untimely by mislabeling it as a successive petition. The State therefore argued that Franklin's petition should be dismissed as untimely and that, in any event, it lacked substantive merit where "the man" alluded to in Hansbrough's affidavit as "the real gunman" remains unidentified. Furthermore, the State contended that the affidavit only

7

averred that "the man" simply stated that Hansbrough was "a crack-head and a stupid drunk." The unknown person never claimed to be the real shooter.

¶ 33 On December 9, 2022, the court denied the State's motion to dismiss and advanced the cause for a stage three evidentiary hearing to hear testimony from Hansbrough. The evidentiary hearing began on November 1, 2023. Hansbrough's testimony was consistent with his affidavit. He added that, on the day in question, he had been drinking and doing drugs all day and night and that time was "a blur." Hansbrough testified that he had never seen Franklin prior to the night in question. Hansbrough acknowledged that the police visited him in the hospital and showed him a photo array. Hansbrough testified that he circled a picture of a man who he thought had shot him. He "mistakenly" circled a photo of Franklin after being under the heavy influence of medication after surgery for his gunshot wound. Hansbrough stated that he executed his affidavit "after [his] conscience was weighing heavily on [him]." No one asked or threatened Hansbrough to execute his affidavit.

¶ 34 Hansbrough testified that he met the unknown person he referred to in his affidavit on the street while walking to his brother's house, "probably sometime in April" of 2021. According to Hansbrough, he was met by "a guy" on the street who told him that he—the unknown individual— was grateful that Hansbrough was a drunk and crack-head, and that Hansbrough "got the wrong man for shooting [him]." Hansbrough did not recognize the man, but said he resembled Franklin. However, Hansbrough said that the man's voice was familiar—it sounded like the gunman who said "F this shit" after the gun jammed during the shooting. When asked what he recalled about the appearance of the unknown man on the street, Hansbrough replied, "He looked like Mr. Franklin a little bit, a lot like him." But Hansbrough was "certain" that the unknown man on the street was the person who shot him.

8

¶ 35 Hansbrough acknowledged that at trial, he testified that he was certain that Franklin was the gunman. When asked to explain his prior identification testimony, he claimed that at trial, he was not in the right mental state or "thinking clearly" due to troubles with his leg and his daughter committing suicide. He also claimed that because of his diabetes and his pancreas not working, he "was very, just, delusional." Hansbrough reiterated that Franklin was not the man who shot him; the shooter was the unknown man he ran into out on the street. He said that his testimony at trial was truthful, but his identification of Franklin as the gunman was simply mistaken.

¶ 36 The State called Danville police officer Patrick Carley, who testified that he met with Hansbrough at the hospital and took a videotaped statement from him. Carley showed Hansbrough a photo array and then arrested Franklin the following day. Hansbrough also described the gun as chrome with a black handle even though the police had not disclosed the description to him. Carley also confirmed that the gun recovered from behind the drywall in the bedroom closet where Franklin kept his clothes was the one that fired the casing found at the scene.

¶ 37 At the close of all evidence, the court found that Hansbrough's trial testimony was more credible than his affidavit and evidentiary hearing testimony. The court pointed out that if Hansbrough was too intoxicated to be reliable in 2017, he would not be any more reliable in 2021. Moreover, Hansbrough could not provide a name or any other details about the unknown man on the street. The court denied Franklin's postconviction petition. This timely appeal followed.

¶ 38                                    II. ANALYSIS

¶ 39 OSAD argues that dismissal of the petition was proper, and there are no meritorious arguments to the contrary. In the supporting memoradum, OSAD states that it considered raising the issue of whether Franklin presented sufficient evidence of actual innocence to warrant a new

9

trial. However, counsel determined that this issue would be without arguable merit. As we agree with counsel's assessment, we grant OSAD leave to withdraw.

¶ 40 The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a statutory remedy to criminal defendants who claim that substantial violations of their constitutional rights occurred at trial. *People v. Taliani*, 2021 IL 125891, ¶ 53; *People v. Edwards*, 2012 IL 111711, ¶ 21. A proceeding under the Act is a collateral proceeding, not an appeal from the judgment of conviction. *People v. English*, 2013 IL 112890, ¶ 21. The Act provides for three stages of postconviction proceedings. *People v. Cotto*, 2016 IL 119006, ¶ 26. At the first stage, "the circuit court determines whether the petition is 'frivolous or is patently without merit.' " *Id.* (quoting 725 ILCS 5/122-2.1(a)(2) (West 2020)). If the petition is not dismissed at first-stage proceedings, it advances to the second stage.

¶ 41 "During second-stage proceedings, the court may appoint counsel for an indigent defendant, who may amend the petition as necessary, and the State may file a motion to dismiss or an answer to the petition." *Id.* ¶ 27 (citing 725 ILCS 5/122-4, 122-5 (West 2020)). At the conclusion of the second stage, the court determines whether the defendant has made a substantial showing of a constitutional violation. *Id.* ¶ 28. If not, the petition may be dismissed. If the requisite showing is made, the petition advances to the third stage, and the court holds an evidentiary hearing. *Id.*

¶ 42 At the third-stage evidentiary hearing, "the circuit court serves as the fact finder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *People v. Domagala*, 2013 IL 113688, ¶ 34. At this stage, the defendant has the burden to prove the denial of a constitutional right by a preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92.

10

¶ 43 After an evidentiary hearing where the circuit court has made fact-finding and credibility determinations, the court's decision will not be reversed unless it is manifestly erroneous. *English*, 2013 IL 112890, ¶ 23. Manifest error is " 'clearly evident, plain, and indisputable.' " *Coleman*, 2013 IL 113307, ¶ 98 (quoting *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)). Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident. *Id.*

¶ 44 In the present matter, the only claim that advanced to the third-stage evidentiary hearing was actual innocence, based on the victim's retracted identification testimony. As our supreme court has explained,

> "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. [Citations.] Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. [Citation.] Evidence is material if it is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative evidence adds to the information that the fact finder heard at trial. [Citation.] Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *People v. Robinson*, 2020 IL 123849, ¶ 47.

The most important element of an actual innocence claim is the conclusive character of the new evidence. *Id.* Put another way, the evidence must raise "the probability that it is more likely than not that no reasonable juror would have convicted" the defendant. (Internal quotation marks omitted.) *Edwards*, 2012 IL 111711, ¶ 24.

¶ 45 Our supreme court has acknowledged that the standard for an actual innocence claim "is extraordinarily difficult to meet." *Coleman*, 2013 IL 113307, ¶ 94. The circuit court, serving as the

finder of fact, must consider whether the newly discovered evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. *Id.* ¶ 97. But the court should not "redecide the defendant's guilt in deciding whether to grant relief." *Id.* Indeed, the circuit court is not assessing the sufficiency of the State's evidence to convict beyond a reasonable doubt; if this were the case, the remedy would be an acquittal, not a new trial. *Id.*

¶ 46   Here, Franklin asserted in his postconviction petition that the affidavit and evidentiary hearing testimony of Bobby Hansbrough established his actual innocence and justified a new trial. At the evidentiary hearing, Hansbrough testified consistently with his affidavit, stating that he had been drinking and doing drugs all day and night and it was all "a blur." He acknowledged that he "circled a picture of a man [he] thought shot [him]" when the police showed him a photo array at the hospital. However, he claimed that he mistakenly circled a photo of Franklin while under the heavy influence of medication after surgery for his gunshot wound.

¶ 47   According to Hansbrough, he was met by an unknown man on the street, who said he was grateful that Hansbrough was a drunk and crack-head, and thankful that Hansbrough "got the wrong man" for the shooting. Hansbrough did not recognize the man, but said he resembled Franklin. He also noticed that the man's voice sounded like the shooter's when he said "F this shit" after the gun jammed.

¶ 48   OSAD argues that Hansbrough's testimony made little sense and is not conclusive such that it would probably change the result on retrial. We agree. Hansbrough not only identified Franklin as the shooter in the police photo array, but also testified at trial that he had no doubt in his mind that Franklin was the man who shot him, and that he used the same chrome gun with a black handle that he had previously brandished at Hansbrough in the apartment. While he later

12

testified at the evidentiary hearing that he was "delusional" and not thinking clearly at trial, nothing in the record suggests that the jury was not able to consider his demeanor and behavior at trial in assessing his credibility.

¶ 49    Furthermore, Hansbrough's description of the weapon was consistent with the description of the gun found behind the drywall in the closet where Franklin kept his clothes. He was also able to describe the gun used in the shooting without the police disclosing this information to him, despite the medicated, post-surgery state he was in at the time. The firearms expert testified that this same gun was the gun that fired the casing found near Hansbrough's head after the shooting. Hansbrough also identified the maroon or reddish minivan in which Clark testified Franklin drove away.

¶ 50    After the hearing, the court determined that Hansbrough's trial testimony was more credible than his affidavit and evidentiary hearing testimony, noting specifically that if Hansbrough was too intoxicated to be reliable in 2017, he would not be any more reliable in 2021. We agree with this assessment—if Hansbrough described the events of that date as a blur, there is no explanation provided as to why he would be able to recall certain details with greater clarity years later. Nor was there an explanation as to whether the issues preventing him from thinking clearly at trial were no longer affecting him during the hearing. Additionally, Hansbrough could not provide a name or any other details about the unknown man he met on the street.

¶ 51    Moreover, Clark testified at trial about Franklin keeping his clothes in the closet where the gun was hidden. She also said she was worried about fighting breaking out with the unknown man—Hansbrough—in her apartment, because everyone else was already agitated and they were irritated with the drunken intruder. Considering this and other trial testimony, we find that, even if Franklin's proffered evidence was new, material, and noncumulative, his actual innocence claim

13

was properly dismissed because the evidence was not conclusive. Again, this is the most important element of an actual innocence claim. Here, the new evidence fails to show that it is more likely than not that no reasonable juror would have convicted Franklin if it had been presented with Hansbrough's affidavit.

¶ 52    We therefore defer to the circuit court's findings of fact and determinations of credibility at the third-stage hearing, and find that its decision was not manifestly erroneous. Its denial of Franklin's postconviction petition was proper where the opposite conclusion was far from clearly evident. We find that there is no meritorious argument that OSAD could bring on appeal that the circuit court erred in dismissing Franklin's actual innocence claim.

¶ 53                                    III. CONCLUSION

¶ 54    As this appeal presents no issue of arguable merit, we grant OSAD leave to withdraw and affirm the circuit court's judgment.

¶ 55    Motion granted; judgment affirmed.